DETROIT WABEEK BANK & TRUST COMPANY *v.* CITY OF ADRIAN.

1. **Wills—Parol Testimony—Ambiguity.**

Parol testimony cannot be resorted to in .order to add to, vary or contradict the language of a will that is unambiguous on . its face.

2. **Same—Construction of a Will—Ambiguity.**

The mere filing of a bill for construction of a will does not thereby make the will or any of its terms ambiguous, the determination of whether or not it is ambiguous being essentially a judicial function.

3. **Same—Parol Testimony—Ambiguity—Evidence.**

Testimony of the sister-in-law of testatrix and various officers of contingent beneficiary, a university, as to the intent of testatrix *held,* incompetent and inadmissible in trustee's suit to construe an unambiguous will.

4. **Same—Intent—Construction of Will.**

The meaning of a will, unambiguous on its face, cannot ever be said to depend on what another individual may think it means, where it is sought to be shown that the widower of testatrix took certain action after her death by reason of what he had construed her will to have intended.

---

References for Points in Headnotes

[1, 5] 57 Am Jur, Wills § 1040.
[2] 57 Am Jur, Wills § 1020 *et seq.*
[3] 57 Am Jur, Wills §§ 1042, 1043.

5. SAME—CONSTRUCTION—INTENT.

All rules of testamentary construction must bow to the paramount rule that the intent of the testator must be given effect, where it is ascertainable and lawful.

6. SAME—CONSTRUCTION OF BEQUEST.

Will providing that trust therein created should, in the event testatrix' husband survived her and did not "by his will create a trust fund for the purpose of maintaining and developing property located in Franklin township, * * * known as 'Hidden Lake Gardens' or for some other purpose entirely for the benefit of the public, then I will and direct that * * * trustee shall pay the income from said fund to the city * * * for the purpose of beautifying its public parks, or any other public properties located within the limits of said city" is construed as leaving the trust to the city, where it appears that her husband did survive her, established a trust *inter vivos* for the gardens and made no provision therefor in his will.

7. SAME—INTENT.

An unambiguous will which bears the stamp of professional craftsmanship and which was drafted by an able, experienced and ethical attorney who was long familiar with the affairs of the testatrix and her husband to whom was given a power of appointment which he failed to exercise after her death will be assumed to express the testatrix's whole intention.

DETHMERS, C. J., and SHARPE, J., dissenting.

Appeal from Lenawee; Martin (Rex B.), J. Submitted January 17, 1957. (Docket No. 65, Calendar No. 46,855.) Decided July 31, 1957.

Bill by Detroit Wabeek Bank & Trust Company, a Michigan corporation, trustee of the estate of Harriet Kimball Fee, deceased, against the City of Adrian, a municipal corporation, the State Board of Agriculture, a Michigan corporation, and Jessie T. Fee for construction of will determining rights of defendants to trust provisions. Decree adjudging defendant City of Adrian so entitled. Defendants State Board of Agriculture and Jessie T. Fee appeal. Affirmed.

*Sigler, Anderson & Carr* (*Leland W. Carr, Jr.*, of counsel), for defendants State Board of Agriculture and Jessie T. Fee.

*Edward N. Mack,* for defendant City of Adrian.

VOELKER, J.     For many years Harriet Kimball Fee and her husband Harry A. Fee were among the leading citizens of Adrian.   They were public-spirited people of considerable means and their public and private charities and philanthropies were many and varied and of long standing.   One of their favorite projects was the development and maintenance of a property owned by Mr. Fee and located in Franklin township in their home county known as "Hidden Lake Gardens."

In a will dated December 31, 1943, Harriet Fee provided that if her husband should in his will create a trust for the benefit of Hidden Lake Gardens or some other public purpose then the residue of the estate created under her will should be added to the testamentary trust created by her husband.   Her will further provided that if the husband failed to create such a trust by his will then the income of her trust estate should go to the city of Adrian "for the purpose of beautifying its public parks, or other public properties located within the limits of said city of Adrian."

Harriet Fee died in January, 1945, and her will was duly admitted to probate in her home county, Lenawee.   Her husband died on May 2, 1955, leaving a last will dated May 24, 1951, which was also admitted to probate in the same county.   In his will the husband failed to provide for any trust for said gardens or for any other public purpose.   His only mention of the gardens was that he wanted his ashes to repose there.   However, following the death of his wife he did create 2 *inter vivos* trusts for the benefit

of Hidden Lake Gardens. Also, following his wife's death and before the establishment of the 2 living trusts just noted, Harry Fee by 2 gifts of warranty deed conveyed the fee of said Hidden Lake Gardens to the defendant State board of agriculture without reverter.

Harriet Fee's will provided certain specific bequests and, also, income for life for certain individuals. Paragraph 5 then provided as follows:

"I give, devise and bequeath to my husband, Harry A. Fee, if he be living at the time of my death, all the rest and residue of my property, of every kind and nature, after compliance with the foregoing provisions of this will, in trust, however, to hold, invest and reinvest, and out of the income to pay to Jessie Gibford, of Adrian, Michigan, the sum of $100 each month so long as she shall live, and the remainder of the income shall be paid by my said trustee to himself during his lifetime.

"It is my wish that my husband, Harry A. Fee, shall pay to his sister, Jessie T. Fee, such an amount out of the income from said trust estate as he shall deem reasonable and proper.

"If my husband, Harry A. Fee, declines to accept for any specified interval any part or all of the income from said trust for himself, then and in that event he shall have full power, right and authority as trustee to pay any such income not so accepted to such individual, individuals, or agency, or agencies, as he may deem fit and worthy.

"Upon the death of the said Harry A. Fee I give, devise and bequeath said trust estate to the Detroit Trust Company, of Detroit, Michigan, or its successors, as trustees, and the said trustee shall pay from the income therefrom the sum of $100 each month to Jessie Gibford, of Adrian, Michigan, so long as she shall live, and the remainder of said income to my sister-in-law, Jessie T. Fee, so long as she shall live. If said Jessie T. Fee shall predecease Jessie Gib-

ford then the remainder of the income, after making the payment to Jessie Gibford, shall be paid to the State board of agriculture, to be used in maintaining and developing property known as 'Hidden Lake Gardens'. Upon the death of the survivor of Jessie T. Fee and Jessie Gibford said trust estate shall be used for the purposes stated and set forth in the eighth paragraph of this, my will. In the event that my said husband, Harry A. Fee, does not by his will create a trust fund for the purpose of maintaining and developing property located in Franklin township, Lenawee county, Michigan, now owned by him, and known as 'Hidden Lake Gardens', or for some other purpose entirely for the benefit of the public, then I will and direct that said Detroit Trust Company and its successors, as trustee, shall pay the income from said fund to the city of Adrian, Lenawee county, Michigan, for the purpose of beautifying its public parks, or any other public properties located within the limits of said city of Adrian."

Paragraph 8 provides:

"Should my said husband, Harry A. Fee, precede me in death, then I will and direct that after the death of Jessie Gibford, and my sister-in-law, Jessie T. Fee, and after the payment of all bequests herein provided for, all the remainder of my property shall become a part of a trust fund provided for in the last will and testament of my said husband, Harry A. Fee, for maintaining and developing property located in Franklin township, Lenawee county, Michigan, now owned by him, and known as 'Hidden Lake Gardens', the same to be administered by the same trustee as shall have been named as trustee in the estate of my husband, Harry A. Fee, as a part of such trust fund, and in the same manner, and the net income from the same shall be used for the same purposes and in the same manner as set forth in said provision of his will, except as hereinbefore provided."

The record discloses that during their lifetime the Fees were fully familiar with the business, legal and charitable concerns and interests of the other, many of which they shared in common, and that for many years their legal and other affairs were handled by a competent and trusted Adrian attorney, Mr. W. B. Alexander (who died before the suit in this case), who also drew their last wills and their frequently-amended earlier wills. This same attorney drafted and attended to the execution of the last will of Harry Fee on the same day that he also attended to the drafting and execution of the second living trust of Harry Fee, both on May 24, 1951. Both this living trust and the earlier one provided that the net income should be paid upon the death of certain life beneficiaries to the State board of agriculture for the "upkeep, maintenance and development of Hidden Lake Gardens" earlier deeded by Harry Fee to the State board of agriculture.

On January 25, 1946, the plaintiff trust company was appointed trustee under the last will of Harriet Fee and, following the death of Harry Fee, filed its bill of complaint to obtain a judicial construction of Harriet's will, naming the State board of agriculture and the city of Adrian among the defendants. Jessie T. Fee, a sister of Harry Fee, was also named a party defendant, although she had earlier renounced under Harriet's will.

The board made answer to the general effect that the conveyances made and trusts created by Harry Fee during his lifetime were in fulfillment of a common plan or purpose and constituted substantial compliance with the requirements and provisions of his wife's will; the sister-in-law, Jessie Fee, answered in the same general tenor; and, as might be expected, the city made answer that failure of Harry Fee to create a trust for a public purpose by his will entitled it and not the board to the ultimate

beneficial proceeds of the trust created under the will of Harriet. Further pertinent facts will be developed in this opinion, and for convenience the defendants State board of agriculture and city of Adrian will occasionally be referred to as board and city.

At the hearing below and to show the intent of the testatrix the board called the defendant Jessie Fee and various officials of Michigan State University to repeat certain conversations they had had with Harry Fee in which Mr. Fee, after his wife's death, had expressed his ideas of the effect of his wife's will and how he thought Hidden Lake Gardens would be getting the benefits from her trust upon his death. The testimony of Jessie Fee was further offered to show conversations she had with her brother and his wife and to show that the parties were mutually agreed that Michigan State University should be given the gardens and that the Fees should help finance it. Upon objection all of this testimony was excluded as incompetent and has been preserved in a special record. At the conclusion of the hearing the trial court held that due to the failure of Harry Fee to by his will set up a trust for a public purpose that the alternative grant to the city of Adrian under Harriet's will became effective. From a decree entered accordingly, this appeal has resulted.

We shall first dispose of the matter of the testimony that was held incompetent and inadmissible below. In our view the ruling of the court was correct. We do not think the testimony of Harry Fee himself would be competent as to what he thought his wife's will meant, and therefore it would seem to follow that strangers should all the more not be permitted to testify after his death as to what he may have said or thought it meant. Nor do we, under this will, think it was competent for Jessie Fee to give the testimony she sought to give as to alleged

past conversations with her deceased brother and sister-in-law on the subject.

We have long held that parol testimony cannot be resorted to to add to, vary or contradict the language of a will unambiguous on its face. Nor may parol testimony of a testator's intention in making a will be given or properly received. The mere filing of a bill for construction of a will does not thereby make the will or any of its terms ambiguous any more than does the fact that competing litigants differ in their views as to the proper construction of the language or provisions in a will. The determination of whether ambiguity exists in a will is essentially a judicial function. Any other rule would open the door to all manner of testimony and speculation over the meaning of wills, which would thus by the mere fact of litigation in every case be at the mercy of possibly illy-recollected tea-time conversation and rumor and ancient gossip by volunteers and other persons whose memories might occasionally unconsciously be warped or stimulated by their present loyalties, monetary or emotional. See, generally: *In re Blodgett's Estate,* 197 Mich 455; *Gardner* v. *City National Bank,* 267 Mich 270; and *Townsend* v. *Gordon,* 308 Mich 438 (151 ALR 1432).

We turn now to the heart of this case: the meaning of Harriet Fee's will. Appellant in its brief attaches special importance to the fact that Harry Fee's last will was executed at the time of the second "State board" trust, and that the same attorney attended to the drafting and execution of the various wills, deeds and living trusts. "It is particularly significant," it urges, "that the same able attorney who prepared Mrs. Fee's will acted for Mr. Fee in the preparation and execution of the deeds and trust instruments made by the latter. * * * Testimony offered by defendant city of Adrian discloses that

Mr. and Mrs. Fee were in consultation with Mr. Alexander regarding the drafting of the latter's will. What Mr. Fee did subsequently with the benefit of Mr. Alexander's counsel must have been regarded by the parties as in compliance with the general plan and purpose already established. It is most significant that the second trust instrument prepared by Mr. Alexander was executed on the same day that Harry A. Fee's last will and testament was executed. * * * Clearly the subject matter of Hidden Lake Gardens was in Mr. Alexander's mind on the day he drew the second trust and the will for Harry A. Fee. It is inconceivable that he would have permitted his client to proceed on any erroneous assumption with reference to the effect that such action might have on the last will and testament of Harriet Kimball Fee."

Unfortunately under Emerson's well-known law of compensation we believe that much the same general argument could be advanced with equal eloquence and force to show that Harry Fee and his able attorney were indeed fully informed concerning what they were about and did what they did deliberately and with full knowledge of the legal and other consequences.

We also note that the second Harry Fee trust contains a provision absent from the first calling upon the trustee to cause periodic inspections of the gardens to be made to determine whether their development and maintenance was being "neglected" by the board, with the further provision that if they were found to be neglected, "then the funds that would normally be paid to the State board of agriculture shall be paid instead to the city of Adrian, Michigan, for the ensuing year, to be used by it solely for the upkeep and development of its various parks," such payments to the city to be continued in the future until it was found upon further inspections

that any such neglect was abated. There then follows, in this second trust, an elaborately detailed schedule of "Suggestions as to Inspections" concerning provision for the mowing of grass, the planting of trees, shrubs and perennial plants, the building of roads, lanes and fences, the establishment of facilities for picnickers, et cetera, and concluding with the curiously touching poetic suggestion by Mr. Fee, which we cannot resist quoting, that the best times to inspect the gardens "would be around lilac time and sometime in August."

So we see that on the very day Harry Fee drew his will, in which he failed to establish the public trust that would have made operative the disputed provision of his wife's will in favor of the board, not only was he sharply concerned to the point of apprehension with the future of the Hidden Lake Gardens, for which he then, and had already, provided so handsomely, but he was also thinking of the city of Adrian, and making provision for it under certain contingencies for purposes and in language rather strikingly similar to that employed by his wife in one of the disputed portions of her will.

In a sense the board seeks not so much a favorable construction of Harriet's will as a favorable construction of what Harry Fee may have thought it meant. While we do not think the board has made out a persuasive case tending to show even that, we might concede that it has and still be obliged to hold against it for the rather elementary reason that the meaning of a will, unambiguous on its face, cannot ever be said to depend on what another individual may think it means.

We observe too that for all the undoubted concern the Fees had for the gardens, Harriet's carefully drawn will did not limit her husband to creating a trust only for their benefit. He could satisfy this requirement by creating *any* trust for *any* public

purpose. Further, whatever general plan or broad mutual purpose the Fees may have possessed regarding the future of the gardens, the provision in Mrs. Fee's will plainly contemplated that for the board to prevail Mr. Fee should in his will perform an affirmative act in the light of future needs and conditions. In effect he was given a broad power or powers of appointment which he could exercise on the one hand affirmatively for the board or on the other negatively for the city.

Two of the cases offered by the board to sustain its position are *Kiefer* v. *German American Seminary of the City of Detroit,* 46 Mich 636; and *Kirsher* v. *Todd,* 195 Mich 297. The *Kiefer Case* does not involve the construction of a will and the *Kirsher Case* involved after-acquired property not disposed of by the will. Moreover it is clear from the will and surrounding circumstances in the latter case that in any event the plaintiff had no legal or equitable rights to the disputed assets, will or no will.

Nor do the cases of *In re Hicks Estate,* 345 Mich 448; *In re Ives' Estate,* 182 Mich 699; or *In re Hunter's Estate,* 212 Mich 380, afford appellant board the comfort it apparently seeks to draw from them. These cases involved general rules of judicial construction in cases of disputed testamentary gifts to a class and shed little guiding light on our present situation. We may add that all rules of testamentary construction, however helpful at times, must bow to the paramount rule that, where ascertainable and lawful, the intent of the testator must be given effect. (See page 451 of the *Hicks Case, supra.*) We also believe that the intent of Harriet Fee as expressed in her will is both lawful and plainly ascertainable.

We like and adopt the following excerpts from the trial court's opinion:

"Harriet Fee in effect told her husband that if he wanted Hidden Lake Gardens to have her money he

must definitely set up a trust by his will which would determine all the rights, duties and regulations of the trustee and would be the trust into which her money went. She used this particular form of providing for the gardens or alternate beneficiaries with the idea in mind that her husband could create a testamentary trust, he could alter that trust as to amount or purposes should Hidden Lake Gardens need or deserve more or less funds. And he could revoke it any time before he died. It gave him the right to have a good deal of control over the expenditure of funds during his life time and a right to deprive Hidden Lake Gardens of any funds by simply failing to do an affirmative act."

"The very wording of the will shows testatrix was giving Harry Fee complete control of the income of the trust for his life. She gave him the right to choose at his death where the income would go. It is apparent she felt that if after her death circumstances arose that would cause Harry Fee to decide Hidden Lake Gardens should not be the recipient of her trust, Harry Fee could in effect disinherit Hidden Lake Gardens by failing to provide for it in his will. Looking at the trusts of Harry Fee, we find he gave tremendous sums of money in his lifetime for Hidden Lake Gardens. We note he attached definite strings to trust No. 2 whereby the city of Adrian would be benefited by that trust if the gardens were neglected. At the time he created his last *inter vivos* trust, he likewise consulted Mr. Alexander and had his last will drawn and executed. The last will neither expressly states Harry Fee intended his wife's trust to go to the city of Adrian nor does it expressly state that Harry Fee intended his wife's trust to go to the defendant State board. It shows that he is still mindful of the public by making direct grants to the Bixby Hospital and the Toledo Museum of Art. He mentions Hidden Lake Gardens as the final depository for his ashes."

In all truth, on its precise facts our case seems fairly unique in its field. At least counsel has not pointed out another case too much like it, and we find we neither possess the leisure nor see the need to ourselves wander scholarly afield. Numerous other cases regarding the proper construction of wills are cited by counsel for the various competing defendants in their efforts to maintain their respective positions. Most of these cases contain broad classic statements of the law of both unimpeachable authority and impressive venerability, but unfortunately, as we have noted, none of them on their facts helps us much to decide this case. Accordingly we shall forbear to further clutter this opinion or add to the woes of those who must compile our citators by setting them up like legal ninepins and then knocking them down.

A brief statement made on page 211 of *In re Coots' Estate,* 253 Mich 208, cited and quoted by the city, strikes us as applying with peculiar force to both wills in this case, and to our mind furnishes the simple—or at least 1 obvious—key to our solution.

It was there said: "The will bears the stamp of professional craftmanship, and probably was drafted by the able lawyer who witnessed it. We must assume that it expresses testator's whole intention."

All are agreed here that the Fees' attorney was an experienced, competent and ethical lawyer. The record also shows that he was long familiar with the Fees' affairs and was fully aware of their charitable and testamentary aspirations. We believe we must assume here, as in the *Coots' Case,* that under these circumstances he was also competent to set forth in appropriate legal language in their last wills their entire wishes and intentions.

The decree of the court below is affirmed, with costs to the plaintiff and the city of Adrian.

Smith, Edwards, Kelly, and Black, JJ., concurred with Voelker, J.

Dethmers, C. J. (*dissenting*). I do not concur in affirmance. The cases are myriad which hold that the duty of the court in interpreting or construing a will is to ascertain, from all its parts, the true intent of the testator and, where lawful, to give it effect. They run from *Jameson's Appeal,* 1 Mich 99, to *In re Lawton Estate,* 347 Mich 143. As said in *In re Scheyer's Estate,* 336 Mich 645, 648, 649 (38 ALR2d 835):

" 'The primary rule of construction is to ascertain the true intention of the testator. That intention must be ascertained from a consideration of all the provisions of the will itself and in the light of the circumstances surrounding the testator at the time the will was made and his relations with the several objects of his bounty. Having so ascertained his intention, it is the duty of the court to give that intention effect if that be legally possible.' *Kirsher* v. *Todd,* 195 Mich 297, as quoted with approval in *Re Miner's Estate,* 201 Mich 115, 120."

The trial court found:

"Harriet Fee gave her husband, in whom she justly had full confidence, the right to determine the final use of her trust fund. Primarily, however, she and her husband wanted the money to go to Hidden Lake Gardens and Harriet Fee expected her husband to so permit it unless the gardens were not being properly cared for or used by the State board."

The will and record support and confirm that finding. The will is clearly expressive of an intent and general plan and purpose of testatrix to provide a

continuing source of funds which, together with income from a trust fund to be created by her husband out of his own assets, would be used by the State board of agriculture to develop and maintain Hidden Lake Gardens for the benefit of the public. Does a reading of the entire will permit of the conclusion that it was the testatrix's intent that that clearly expressed general plan and purpose should fail if her husband declined to heed her suggestion of the mechanics whereby his gift might be made and, instead, elected another but equally adequate vehicle for his contribution to the implementing of that general plan and purpose? Does the will disclose an intent that her plan for what was to be done with her money should be subordinate to her suggestion to her husband of how his contribution might be made? Did that "how" mean more to her than the "what"? Every intendment of the will is to the contrary. The fact that the wife's will speaks of the means by which her husband might effectuate her plan and purpose as being by the creation of a trust "by his will," rather than *inter vivos*, seems to me to reflect little more than the assumption on her part that her husband, named in her will as the life beneficiary of the income of her trust estate, would choose to enjoy rather than dispose of the benefits of that income and of his own properties throughout his lifetime, even as she had done during hers. The provision that the husband should create a trust out of his own funds by will is less demanding on his largesse than would be a requirement that he do so *inter vivos*. There is nothing in reason nor common sense, much less in the will or record, to suggest an overriding intent on the part of the testatrix that her general plan and purpose with respect to Hidden Lake Gardens should be defeated if the husband's performance of the condition laid down therefor by the terms of her will should occur at an earlier time and at a greater

sacrifice to him than her will contemplated or required. I see no force in the view of the trial court that the testatrix's controlling purpose was that her husband's creation of the trust fund should be by will rather than *inter vivos* in order to defer to the instant of his last dying gasp the time when he might finally determine whether defendant board was still deserving of their mutual bounty. Inasmuch as his will would have had to be executed during his lifetime, perhaps, as the case proved to be here, no earlier nor later than the time which he might select to create a trust *inter vivos,* the extent of the assured postponing of the evil day of decision would be illusory at best. Nor is it reasonable to believe that the wife, who evidenced by her will so complete a confidence in the judgment of her husband in the premises as to be willing to permit him to direct the flow of her own benefaction to the Hidden Lake Gardens and the defendant board by voice from the grave, intended to deny him the right, in the exercise of the selfsame judgment, to announce and make the gift certain during his lifetime. He did everything contemplated by the wife that was required by the terms of her will to implement her plan and purpose, unless it be held to have been the supervening intent of testatrix, as expressed in her will, that the irrevocability of his action should be deferred to his death. I am unwilling to hold that the will makes anything so purposeless under all the mentioned circumstances the controlling factor.

Though involving different facts and immediate questions of will construction than those at bar, the cases of *In re Ives' Estate,* 182 Mich 699; *In re Hunter's Estate,* 212 Mich 380; and *In re Hicks Estate,* 345 Mich 448, are relevant and properly cited by defendant board for the pertinent proposition that the presence or absence of certain words in a will is to be disregarded whenever necessary in order to give

effect to the manifest intent and purpose of the testator gathered from the entire will. Consonant therewith, I would consider the words "by his will" as being suggestive or permissive only and deny them any mandatory effect which would serve to defeat the testatrix's intent, purpose and plan as disclosed by the will itself.

In *Aldrich* v. *Aldrich,* 40 RI 324, 331, 332 (100 A 882), the court said:

"The rule as to construction in such cases is well established, and is clearly stated in 2 Woerner's American Law of Administration, § 416, as follows: 'It is a familiar and very important rule, also, that the general intention is to control the particular intention, if there be an irreconcilable inconsistency between them. Where, for instance, the will directs a purpose to be accomplished, and also points out the means by which the result is to be reached, which means turn out to be inadequate to accomplish the end, so that the provisions cannot both be carried into effect, it is evident that the directions pointing out the means must be sacrificed to the accomplishment of the end, if the end can be accomplished by other means; for otherwise the testator's intention is entirely defeated.' See, also, 40 Cyc, p 1393; 1 Redfield on Wills (4th ed), 433; Schouler on Wills (2d ed), § 468; 30 Am & Eng Encyc of Law, p 687; 1 Jarman on Wills (6th ed), 575."

In Thompson on Wills (3d ed), § 215, p 332, it is said, "The manifest general scheme and purpose of the testator as contained in the whole will must prevail over a strict grammatical construction of isolated clauses and sentences," citing *Martin* v. *Thompson,* 191 Ky 102 (229 SW 112); *Manning* v. *Manning,* 229 Mass 527 (118 NE 676); *Sears* v. *Childs,* 309 Mass 337 (35 NE2d 663); *First Methodist Church of Vineland* v. *Pennock,* 130 NJ Eq 452 (22 A2d 889); *Roberts* v. *Claster,* 49 Dauph (Pa) 256.

Again, in section 218, pp 338, 339, it is said, "The general intention to accomplish a certain end will control a particular intention relative to the means of accomplishing it, if the means provided are inadequate and the general intention can be accomplished by other means," citing *Cox* v. *Anderson,* 24 Ky L Rep 1081 (70 SW 839); *Demeritt* v. *Young,* 72 NH 202 (55 A 1047); *Aldrich* v. *Aldrich, supra; Holmes* v. *Walter,* 118 Wis 409 (95 NW 380, 62 LRA 986). The same should be said of the employment of a means more prompt and efficacious than that suggested by the will. The intention of testatrix to accomplish a certain end should be held to control the suggestion relative to the means of accomplishing it, denying that suggestion the power to thwart accomplishment of her general plan and purpose by other means.

In my view, the husband's creation of the first trust fund constituted full compliance with those terms of testatrix's will upon which defendant State board of agriculture's rights were made contingent, and that trust became the repository into which the benefits under her will were to flow. The second *inter vivos* trust was merely supplemental.

Decree below should be reversed. A decree should enter in this Court in accord with this opinion, with costs to defendant board.

SHARPE, J., concurred with DETHMERS, C. J.

CARR, J., did not sit.